**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID W. SINGLETON, TRUSTEE, ET AL. | : | |
|     Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 08-cv-1385 (JCH) |
| | : | |
| GRADE A MARKET, INC. | : | APRIL 13, 2009 |
|     Defendant. | : | |

**RULING RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 20)**

**I.    INTRODUCTION**

Plaintiffs David W. Singleton, as trustee of the trust under the will of Eric

Singleton, David Berkley, Jill Kohlman, and Georgia Strauss, collectively doing business

as Darien Associates ("plaintiffs"), bring this action against defendant Grade A Market,

Inc. ("Grade A").  Plaintiffs collectively own property in Darien, Connecticut.  Grade A is

a corporation, organized and existing under the laws of Connecticut, and a tenant of

plaintiffs' property.

This lawsuit arises from a dispute between the parties over the construction of a

contract provision that governs the annual rent owed by Grade A to plaintiffs.  In their

Complaint, plaintiffs seek either: (1) a declaratory judgment that the parties must

determine the annual rent according to an appraisal mechanism set forth in their lease

agreement; or, in the alternative, (2) that the court determine the annual rent itself, and

award plaintiffs damages.  In addition, Grade A has brought a counterclaim to recover

monies from plaintiffs which, it claims, were paid in excess of the rent owed.

Plaintiffs have moved for summary judgment on the grounds that there exists no

genuine issue of material fact warranting a trial.  Grade A opposes this Motion.  For the

reasons stated herein, plaintiffs' Motion is granted.

## II.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Generally, when assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III.    BACKGROUND[1]

Plaintiffs are collectively the owners of real property located at, and known as,

---

[1] For the purposes of the instant motion, the court accepts facts undisputed by the parties and supported by evidence as true, and resolves disputed facts in favor of the nonmoving party where there is evidence to support its allegations.

956-968 Boston Post Road, Darien, Connecticut ("the Property").  <u>See</u> Defendant's

Local Rule 56(a)2 Statement ("L.R. 56(a)2 Statement") at ¶ 1.  As owners of the

Property, plaintiffs are the successors in interest to a written lease agreement (the

"Lease") with Grade A.  <u>See id.</u>  The Lease, which was originally entered into on July

12, 1982, was amended by a Modification and Extension Agreement on December 31,

1991 (the "Modification Agreement").  <u>See id.</u> at ¶ 2.

        In the Modification Agreement, plaintiffs and Grade A agreed to the terms and

procedures by which Grade A could extend the Lease for two consecutive five-year

periods, the first of which would commence on September 1, 2007.  <u>See id</u> at ¶ 3.

Specifically, the Modification Agreement provides in paragraph 6(a) that:

> [Grade A] shall have the option to extend [the Lease] for two 5 year periods
> upon all the same conditions as [the Lease], as modified herein, except the
> fixed annual rent for the first extension shall be $150,000.00 or the fair
> market value for comparable space in Darien taking into consideration, <u>inter
> alia</u>, the size of the premises, whichever is greater . . . .

Modification Agreement, exhibit B to Affidavit of David W. Singleton ("Singleton

Affidavit"), at 2.  Paragraph 6(b) of the Modification Agreement adds that:

> If the parties cannot agree as to the fair market value of the leased property,
> fair market value shall be determined by two (2) appraisers who are
> members of the American Association of Real Estate Appraisers. Each party
> shall appoint and be responsible for the cost and expense of one (1)
> appraiser.  If such appraisers cannot agree on the fair market value, they
> shall promptly select a third appraiser, who is also a member of the American
> Association of Real Estate Appraisers.  A written determination of said value
> by any two of the three appraisers shall be final and binding on the parties
> hereto.  Landlord and Tenant shall pay equally for the cost and expense of
> a third appraiser, if any.

<u>Id,</u> at 3.

        Pursuant to paragraph 6(a) of the Modification Agreement, Grade A exercised its

option to extend the term of the Lease for the first five-year period (i.e., September 1, 2007 to August 31, 2012) ("the Option Term").  See L.R. 56(a)2 Statement at ¶ 4.  The parties did not reach an agreement as to the fair market value of the Property, however, and thus a dispute arose over the fixed annual rent Grade A is obligated to pay plaintiffs during the Option Term.  See id. at ¶ 5.

After the rent conflict emerged, plaintiffs attempted to contact the American Association of Real Estate Appraisers ("AAREA") in order to initiate the appraisal process set forth in paragraph 6(b) of the Modification Agreement.  See Singleton Affidavit at ¶ 9.  Yet, despite the diligent efforts of both parties, neither plaintiffs nor Grade A have been able to locate an appraiser who is a member of the AAREA.  See L.R. 56(a)2 Statement at ¶ 6.[2]

Notwithstanding the unavailability of AAREA appraisers, the parties each retained an appraiser to determine the fair market value of the Property.  See id. at ¶ 7. The appraisers selected by the parties have professional qualifications – plaintiffs' appraiser is a member of the Appraisal Institute; Grade A's appraiser is a licensed real estate appraiser in Connecticut – and the record contains no indication that, at the time the appraisers were retained, either party raised an objection to the other's appraiser. See id. at ¶ 7.

---

[2] Plaintiffs state that the AAREA does not currently exist and may never have existed.  See L.R. 56(a)(1) Statement at ¶ 6; Memorandum in Support of Summary Judgment ("Memo. in Supp.") at n.1. They contend that, at the time the parties entered into the Modification Agreement, there existed an entity known as the American Institute of Real Estate Appraisers, which, as a result of a subsequent merger, is now known as the Appraisal Institute.  See See id. at 2-3; Singleton Affidavit at ¶ 9.  Grade A, on the other hand, takes no position on whether the AAREA currently exists, but admits that, despite diligent efforts, neither party has found an appraiser who is a member of that organization.  See L.R. 56(a)2 Statement at ¶ 6.

Each appraiser prepared a written appraisal of the Property.  See id.
Nevertheless, the parties continued to disagree on the Property's fair market value.
See id. at ¶ 8.  Consequently, plaintiffs demanded that, in accordance with paragraph
6(b) of the Modification Agreement, the two retained appraisers select a third appraiser
to participate in the dispute resolution, or, alternatively, that the parties allow a court to
determine the fair market value of the property.  See id.  Grade A responded that, due
to the unavailability of AAREA appraisers, it is not obligated to participate in an
appraisal process.  See id. at ¶ 9.  Rather, Grade A argued, the annual rent must be
fixed at $150,000.00, "the only number at which the parties' minds have clearly met."
Letter, exhibit E to Singleton Affidavit, at 2.

On September 11, 2008, plaintiffs initiated the current suit.  They seek either: (1)
a declaratory judgment that the parties must determine the annual rent according to the
appraisal mechanism set forth in their agreement; or, in the alternative, (2) that this
court determine the annual rent itself, and award plaintiffs damages.  See Complaint
(Doc. No. 1) at 6.  On December 11, 2008, Grade A brought a counterclaim against
plaintiffs to recover monies which, Grade A claims, were paid in excess of the
$150,000.00 annual rent owed during the Option Term.

On December 15, 2008, plaintiffs moved for summary judgment on the grounds
that the only material issue in this case is a legal one, i.e., the construction of
paragraphs 6(a) and 6(b) of the Modification Agreement.  Based on the arguments in its
Memorandum in Opposition, Grade A agrees with plaintiffs that this case presents only
questions of law.  The parties do, of course, disagree on the appropriate resolution of
these legal questions.

IV.    **DISCUSSION**

A.    <u>Contract Law Analysis</u>

The precise question presented in this case – whether a clause in a lease agreement, which clause requires the parties to the lease to settle a rent dispute through appraisal, is rendered void by the unavailability of appraisers with the exact qualifications set forth in the agreement – appears to be one of first impression for both this court and the courts of the State of Connecticut.  The legal principles that govern this question, however, are well established.  Under Connecticut law:

> A lease is a contract.  In construing it, three elementary principles must be kept constantly in mind: (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible.

<u>Ingalls v. Roger Smith Hotels Corp.</u>, 143 Conn. 1, 6 (Conn. 1955).  Furthermore, the applicable standard of review in contract interpretation cases is quite clear.  In Connecticut, "[a]lthough ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law."  <u>Conn. Light & Power Co. v. Lighthouse Landings, Inc.</u>, 279 Conn. 90, 109 (Conn. 2006).  Thus, this court must determine what the parties intended by paragraphs 6(a) and 6(b) of the Modification agreement.

In its Memorandum in Opposition, Grade A argues that, because "the lease language, drafted by the landlord for its benefit, plainly limits the determination of fair

market value to an arbitration conducted by members of the [AAREA]," the intent of the parties was for disputes concerning the fair market value of the property to be resolved by AAREA appraisers only.  Defendant's Memorandum in Opposition to Motion for Summary Judgment ("Memo. in Opp.") at 3.  Plaintiffs, on the other hand, contend that, "[b]y providing that disputes would be decided by appraisers . . . , the parties manifested their clear intent to avoid the cost and delays attendant to other, more formal and costly dispute resolution mechanisms," and further that, "[i]n these circumstances, there can be little question that the designation of the [AAREA] was nothing other than an ancillary logistical concern, and that the non-existence of that Association does not render unenforceable the entire appraisal dispute mechanism set forth in [the Modification Agreement]" (internal quotations omitted).  Memo. in Supp. at 9.  The court agrees.

As noted above, to determine the parties' intent, the court turns first to the language of the Modification Agreement in the light of the circumstances surrounding the parties at the execution of the instrument.  Ingalls v. Roger Smith Hotels Corp., 143 Conn. 1, 6 (Conn. 1955).  In this case, the language concerning the appraisal mechanism is straightforward: "If the parties cannot agree as to the fair market value of the leased property, fair market value shall be determined by two (2) appraisers who are members of the American Association of Real Estate Appraisers."  Modification Agreement, exhibit B to Singleton Affidavit, at 3.  The language contains no clear intent of any special or technical meaning of the terms, and so it is given its ordinary meaning.  Ingalls v. Roger Smith Hotels Corp., 143 Conn. 1, 6 (Conn. 1955).

The language itself reveals no clues as to why the parties included the phrase

"who are members of the [AAREA]" in the appraisal clause. There are no signals indicating either the importance, or unimportance, of the AAREA membership requirement. In fact, based solely on the language of paragraph 6(b), the parties' arguments appear equally plausible – the reference to the AAREA could be either an ancillary logistical concern or a fundamental term. The court must look elsewhere.

Under paragraph 12 of the Modification Agreement, the parties agreed that, "except as herein expressly modified, all the terms and conditions of the Lease shall remain in full force and effect." Id. at 5. Thus, the court next looks to the language of the original Lease, which the parties incorporated by reference in the Modification Agreement.

The original Lease, dated July 12, 1982, does not contain an appraisal provision. It does, however, contain an arbitration agreement which governs rent disputes flowing from changes in the Property due to the exercise of eminent domain. See Lease, exhibit A to Singleton Affidavit, at 11-12. Specifically, paragraph 11 of the Lease states that, "[i]f the parties cannot agree upon the new annual fixed rental after such condemnation or taking within thirty (30) days from the date of vesting in the condemning authority, the same shall be submitted to arbitration." Id. at 12. The incorporation of this clause into the Modification Agreement provides some insight into the parties' intent as to the appraisal clause. Specifically, the fact that the parties chose to leave the binding arbitration provision intact, despite making other substantive changes to the Lease, is evidence of their desire for binding alternative dispute resolution. This suggests that, with respect to the appraisal clause, the parties intended the crux of the clause to be their agreement to be bound by the appraisal process,

rather than their agreement that the appraisers be members of the AAREA.

The court finds further support for this reading of the parties' intent in the absence of certain language in the Modification Agreement.  For example, Grade A's argument that the AAREA membership requirement is a fundamental term, without which the entire appraisal clause fails, would be convincing if the Modification Agreement contained any language evidencing the importance of the AAREA to the resolution of disputes between these parties.  It does not.  Moreover, Grade A has not offered any evidence of the circumstances surrounding the execution of the Modification Agreement which supports its position.  The record contains no evidence that AAREA appraisers are more qualified than appraisers belonging to other professional real estate appraisal organizations.  Similarly, the record contains no evidence that an AAREA appraiser is more suited than a non-AAREA appraiser to assess the specific Property at issue in this case.  Without such evidence, the court has no basis to conclude that the parties intended the AAREA membership requirement to be indispensable to the point of invalidating the entire appraisal clause.

Finally, it bears noting that, under Ingalls v. Roger Smith Hotels Corp., 143 Conn. 1, 6 (Conn. 1955), the Modification Agreement "must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible."  Grade A argues that to give effect to every provision, the court must strictly enforce the AAREA membership requirement.  Memo. in Opp. At 2-3.  This is faulty logic.  If the court adopts Grade A's position and holds that the AAREA membership requirement is an essential term, the result is the invalidation of paragraph 6(b) in its entirety.  If, on the other hand, the court adopts the plaintiffs' position, only the AAREA membership

requirement fails, while the remainder of paragraph 6(b) persists.  This construction

gives effect to a much greater portion of the Modification Agreement, and it is more

closely in keeping with the Connecticut Supreme Court's instruction in Ingalls to

construe a lease "as a whole and in such a manner as to give effect to every provision,

if reasonably possible."  Ingalls v. Roger Smith Hotels Corp., 143 Conn. 1, 6 (Conn.

1955).

   As a result, the court determines that the parties' primary intent in paragraph 6(b)

of the Modification Agreement was for any dispute as to the fair market value of the

Property during the Option term to be settled by means of a binding appraisal process.

The parties intended the AAREA membership requirement to be merely a method of

assuring that the appraisers resolving the dispute would be qualified and disinterested

individuals, rather than an essential term of their appraisal agreement.  Consequently,

plaintiffs are entitled to compel appraisal.  Plaintiffs' Motion for Summary Judgment is

therefore granted, and the parties shall proceed with appraisal as set forth in the

Modification Agreement, using substitute appraisers in place of AAREA appraisers.

See Celebrate Windsor, Inc. v. Harleysville Worcester Ins. Co., 2006 U.S. Dist. LEXIS

27043, *43 (D. Conn. May 2, 2006) (noting plaintiff's ability to compel defendant's

participation in a binding appraisal process).

   B.  Arbitration Law Analysis

   Although neither plaintiffs nor Grade A claim that paragraphs 6(a) and 6(b) of the

Modification Agreement created an arbitration agreement, both parties draw parallels to

state and federal arbitration law in their briefs.[3]

Grade A urges the court to construe the parties' agreement to use AAREA

appraisers as an agreement to arbitrate before a specific arbitral forum.  See Memo. in

Opp. at 4.  As Grade A correctly notes, numerous courts, including the Second Circuit,

have refused to compel arbitration where the arbitral forum upon which the parties

agreed is unavailable to arbitrate the dispute.  See, e.g., Gutfreund v. Weiner (In re

Salomon Inc. Shareholders Derivative Litig.), 68 F.3d 554 (2d Cir. 1995) (refusing to

compel arbitration when the parties had agreed to arbitrate disputes only before the

New York Stock Exchange, and the New York Stock Exchange refused to arbitrate the

particular dispute in question); Provencio v. WMA Securities, Inc., 125 Cal. App. 4th

1028, 1032 (Cal. App. 2d Dist. 2005) ("When the parties to a contract agree to arbitrate

---

[3] In fact, despite arguing that, "[p]laintiffs are not even claiming that the appraisal clause constitutes an agreement to arbitrate . . . [and thus] are not entitled to the general federal policy favoring arbitration," Memo. in Opp. at 9, Grade A refers to the appraisal process set out in the Modification Agreement as a an "arbitration" and the appraisers as "arbitrators."  See Memo. in Opp. at 3 ("[T]he lease language . . . plainly limits the determination of fair market value to an arbitration conducted by members of the [AAREA]"); Memo. in Opp. at 4 ("The non-binding authority cited by plaintiffs for the proposition that the court should make a determination as to whether the designated arbitrators set forth in the agreement are 'integral' or 'central' to the agreement plainly conflict with . . . Connecticut arbitration and basic contract law") (emphasis added).

The parties' reliance on cases involving arbitration agreements is not misplaced.  Connecticut courts have long recognized the close relationship between, and periodic overlap of, appraisal and arbitration.  See, e.g., Covenant Ins. Co. v. Banks, 177 Conn. 273 (Conn. 1979) (holding that an appraisal clause in an insurance contract constituted a written agreement to arbitrate within the meaning of Connecticut's arbitration law).  Further, both federal and Connecticut law strongly favor arbitration as a means of resolving disputes with limited involvement from heavily-burdened courts.  See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 (1983) ("Congress's clear intent, in the Arbitration Act, [was] to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible"); McCann v. Dep't of Envtl. Prot., 288 Conn. 203, 214 (Conn. 2008) ("Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution").  While neither federal nor Connecticut courts have specifically adopted a similar policy favoring appraisal, in a case such as the one before this court – where a contract calls for dispute resolution through a binding appraisal process, and such process would completely dispose of the case – appraisal is akin to arbitration and therefore it is logical for the court to favor appraisal for the same reasons arbitration is generally favored.

any disputes before a particular forum, that provision becomes an integral part of their contract.  If that forum is not available to hear the dispute, then a petition to compel arbitration may not be granted"); but see HZI Research Ctr. v. Sun Instruments Japan Co., 1995 U.S. Dist. LEXIS 13707, *8 (S.D.N.Y. Sept. 19, 1995) (holding that the non-existence of the arbitral organization referred to in the arbitration agreement "furnishes no impediment to enforcement of the arbitration agreement," because "[t]he dominant purpose of the parties, clearly expressed in their contract, was to resolve disputes by arbitration.  If the parties imperfectly or incorrectly designate the instrumentality through which arbitration should be effected, the court will enforce the contract by making an appropriate designation"). The cases Grade A cites, however, are inapposite.

In the present case, the parties did not agree that a dispute concerning the fair market value of the Property should be resolved in a particular dispute resolution forum (e.g., the NYSE or the American Arbitration Association).  Rather, they agreed that such a dispute should be resolved by persons having a certain attribute or qualification (i.e., appraisers with AAREA membership).  The distinction is important.  When parties designate a specific arbitral forum, such designation has wide-ranging substantive implications that may affect, inter alia, the arbitrator-selection process, the law, procedures, and rules that govern the arbitration, the enforcement of the arbitral award, and the cost of the arbitration.  In contrast, when parties agree that the arbitrators must have certain qualifications, this agreement has a much narrower effect – it merely sets a minimum threshold for the quality of the arbitrators.  Consequently, rather than seeking guidance from arbitration precedent in which the parties' choice of arbitral forum was unavailable, the court looks instead to cases in which an arbitrator with the

parties' required qualifications was unavailable.

In DeOliveira v. Liberty Mut. Ins. Co., 2003 Conn. Super. LEXIS 1353 (Conn. Super. Ct. May 1, 2003), the court considered precisely such a situation.  In that case, the parties agreed to arbitrate a workers' compensation claim before Judge Frederick Freedman, who served as a Judge Trial Referee in Connecticut at the time.  See id. at *2.  Under the Connecticut Code of Judicial Conduct, however, Judge Freedman was barred from serving as an arbitrator in the case.  See id.  Upon learning of Judge Freedman's unavailability, the plaintiff refused to proceed with arbitration under a substitute arbitrator, arguing that he agreed to utilize "the services of Judge Freedman . . . and only the services of Judge Freedman . . . ."  Id. at *3.  The defendant moved to compel arbitration.

In its analysis, the DeOliveira court noted that both the Connecticut arbitration statutes and the Federal Arbitration Act anticipate such a situation.  Specifically, under section 52-411 of the Connecticut General Statutes:

> (a) If, in a written agreement to arbitrate, a method of appointing an arbitrator or arbitrators or an umpire has been provided, the method shall be followed. (b) If no method is provided therein, . . . or if any arbitrator or umpire dies or is unable or refuses to serve, upon application by a party to the arbitration agreement, the superior court for the judicial district in which one of the parties resides . . . shall appoint an arbitrator or arbitrators or umpire as the case may require.

Conn. Gen. Stat. § 52-411.  Similarly, under the Federal Arbitration Act ("FAA"):

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, . . . or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same

-13-

force and effect as if he or they had been specifically named therein . . . .

9 U.S.C. § 5.  The DeOliveira court also noted that, although the FAA did not apply to

the agreement it was considering, "[d]ue to the similarities in [the Connecticut arbitration

statute and the FAA] and the dearth of cases decided under . . . the Connecticut

statute, it is instructive to examine case law under the federal statute."  DeOliveira v.

Liberty Mut. Ins. Co., 2003 Conn. Super. LEXIS 1353, *12 (Conn. Super. Ct. May 1,

2003).  The court then cited federal case law for the proposition that, "as a general rule,

where the arbitrator named in the arbitration agreement cannot or will not arbitrate the

dispute, a court does not void the agreement but instead appoints a different arbitrator."

Id. (quoting Astra Footwear Indus. v. Harwyn Int'l, Inc., 442 F. Supp. 907, 910 (S.D.N.Y.

1978), aff'd. mem., 578 F.2d 1366 (2d Cir. 1978)).  Nevertheless, the DeOliveira court

also acknowledged that:

> There is an exception to this rule.  Where it is clear that the failed term is not
> an ancillary logistical concern but rather is as an important a consideration
> as the agreement to arbitrate itself, a court will not sever the failed term from
> the rest of the agreement and the entire arbitration provision will fail.

DeOliveira, 2003 Conn. Super. LEXIS 1353 at *13 (quoting Zechman v. Merrill Lynch,

Pierce, Fenner & Smith, Inc., 742 F. Supp. 1359, 1363 (N.D. Ill. 1990)).  To determine

whether the term that failed is an "ancillary logistical concern" or is "as an important a

consideration as the agreement to arbitrate itself," courts examine "the intent of the

parties at the time the agreement was executed, as determined from the language of

the contract and the surrounding circumstances."  DeOliveira, 2003 Conn. Super.

LEXIS 1353 at *14, *15 (quoting Zechman v. Merrill Lynch, Pierce, Fenner & Smith,

Inc., 742 F. Supp. 1359, 1364 (N.D. Ill. 1990)).

In <u>DeOliveira</u>, the court found that the plaintiff, who was refusing to arbitrate, had "fail[ed] to show that Judge Freedman's service as arbitrator was other than an ancillary logistical concern and that it was as an important a consideration as the agreement to arbitrate itself." <u>DeOliveira</u>, 2003 Conn. Super. LEXIS 1353 at *15. Specifically, the court noted that: 1) Judge Freedman was not available to resolve the dispute; 2) there were "other persons . . . equally available to arbitrate the issues" in the case; and 3) there was "nothing so unusual about the parties' dispute as to require a particular species of arbitrator." <u>Id.</u> Given these facts, the court found that the parties' agreement was "fundamentally an agreement to resolve their disputes through arbitration," and that the designation of Judge Freedman was not intended to be as an important a consideration as the agreement to arbitrate itself. <u>Id.</u>

Thus, as <u>DeOliveira</u> illustrates, whether this court applies contract law or arbitration law to the present dispute, the final inquiry remains the same: Is the essence of paragraph 6(b) of the Modification Agreement the covenant to resolve fair market value disputes through a binding appraisal process, or, alternatively, is the AAREA membership requirement so central to the parties' appraisal agreement that, if no AAREA appraisers are available, the court should decline to require substitutes and should not compel appraisal. For the reasons set forth in Part IV, A, <u>supra</u>, the court holds that, in this case, the parties intended the former. The unavailability of AAREA appraisers does not alter the parties' fundamental agreement. Consequently, plaintiffs' Motion for Summary Judgment is granted and the parties shall proceed with appraisal.

**V.      CONCLUSION**

For the reasons discussed herein, plaintiffs' Motion for Summary Judgment (Doc. No. 20) is **GRANTED**.  The parties are ordered to proceed with the appraisal process set forth in the Modification Agreement.  The two appraisers already appointed by the parties shall select a third appraiser who: (1) is a member of the Appraisal Institute; (2) is licensed as a real estate appraiser in Connecticut; or (3) holds other relevant professional qualifications and whose participation is not objected to by either party.  As the Modification Agreement provides, a written determination of fair market value by any two of the three appraisers shall be final and binding on the parties.

**SO ORDERED**.

Dated this 13th day of April, 2009, at Bridgeport, Connecticut.


 /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge